Present:  All the Justices

MALLORY BUCK, EXECUTOR OF THE
ESTATE OF CALVIN HUGH BUCK

v. Record No. 972315   OPINION BY JUSTICE CYNTHIA D. KINSER
                                          November 6, 1998
SANDRA B. JORDAN, ET AL.

FROM THE CIRCUIT COURT FOR THE CITY OF NORFOLK
Everett A. Martin, Jr., Judge


The primary issue in this appeal concerns the ownership of an investment account registered as belonging to joint tenants with rights of survivorship.  Because the language of the account agreement overcomes the presumption that the account was opened for the convenience of the decedent, we will affirm the circuit court's judgment awarding the funds in the account to the surviving joint tenant.

I.

On July 10, 1991, Calvin Hugh Buck (Buck) and his daughter Sandra B. Jordan (Jordan) opened a joint investment account (the Account) with Sovran Investment Corporation, NationsSecurities' predecessor.  Buck and Jordan signed a form titled "New Account Information" (the Agreement) and entered into the Account as "Joint Tenants with Rights of Survivorship and not as tenants in common or

as tenants by the entirety."[1]  The parties do not dispute that Buck funded the Account with $100,000 and that the funds were used to purchase a United States Treasury Note.

After Buck suffered a stroke in May 1995, he and his family met on November 4, 1995, to discuss his business affairs.  During this meeting, Buck learned that Jordan had withdrawn $30,000 from one of the bank accounts he held jointly with her.  Buck asked Jordan to put the money back into the bank account, but Jordan refused and stated that she was going to have her father evaluated to determine his competency.

After this dispute, Buck removed Jordan's name from several joint accounts.  With regard to the Account at NationsSecurities, Buck specifically asked his son, Ronald Buck (Ronald), on two separate occasions to call

---

[1] The Agreement signed by Buck and Jordan further provided that "[i]n the event of the death of either or any of the undersigned, the entire interest in the Joint Account shall be vested in the survivor or survivors on the same terms and conditions as theretofore held, without in any manner releasing the undersigned or their estates from the liability provided for in this Agreement."

In August 1993, NationsSecurities sent out a new account agreement in order to update its records.  Jordan concedes that she signed her name and Buck's name on this agreement.  In completing the Account papers, Jordan checked two boxes, one for "Rights of survivorship" and one for "Tenants in common."  Since none of the parties contends that this second agreement has any effect on the outcome of this case, we will not consider it in our decision.

NationsSecurities and inquire as to how the Account was set up. Buck wanted to know whether he had made Jordan the beneficiary of the Account and, if so, what steps he needed to take to remove her as the beneficiary. Accordingly, Ronald called NationsSecurities twice and spoke with Sue Carmen (Carmen) each time. Ronald testified as follows regarding the first conversation:

Q. And what did she tell you?

A. She told me that the account was joint tenants in common and I asked her, I said, "What does that mean?" She said, "That means that both own equal shares in the account and if one passes away the Estate of that individual will receive that half and the other living party will get half".

Ronald testified that when he called NationsSecurities the second time, he initially spoke with a receptionist who advised him that the Account was "joint survivorship," meaning "if one passes away . . . the survivor gets 100 percent of the account." Kenneth C. Buck was listening to the conversation on another telephone and related this information to his father. Buck then directed Ronald to advise the person on the telephone that he wanted to take his money out of the Account. When Ronald relayed this directive to that person, the individual decided to connect him with someone who would be more familiar with the Account. Ultimately, Ronald again talked with Carmen. At

3

trial, Ronald recounted his second conversation with Carmen:

> A. I told her what the receptionist said, or whoever the lady was that answered the phone, and she was very disturbed. She said, "This individual has no knowledge on this account whatsoever."
>
> Q. This individual, meaning who?
>
> A. The lady that answered the phone that first talked to me. She said, "I am very familiar with the account. I have already told you one time that it was joint tenants in common and that's the way it is". I said, "Well, my father wanted to know if he could draw the money out", and she said, "Yes. He can draw the money out or Sandra can draw it out, but both names will be on the check".
>
> Q. All right. Did she explain again what she meant by that?
>
> A. She told me again, assured me, to tell my father that it was 50 percent each or joint ownership and that joint tenants in common, she said, is initialled "J.T.C." on the account.

After this call to NationsSecurities, Buck concluded that it would be pointless to withdraw the funds since the check would have Jordan's name on it and he could not cash it without her signature. Based on the information from Carmen that 50 percent of the funds in the Account would go to Jordan and 50 percent to the Estate, Buck reasoned that

4

it would be better to leave the funds in the Account so that they would continue to earn interest.[2]

Stephanie Adler Calliott, Senior Vice-President at NationsSecurities, admitted that the information given to Ronald that the Account was held as a tenancy in common was incorrect.  However, she also testified that, if Buck had asked NationsSecurities to liquidate the Account in 1995, the check would have been made payable to the parties exactly as the Account was titled, that is, to C. H. Buck and Sandra B. Jordan as joint tenants.  She further explained that NationsSecurities' policy of issuing a check exactly as an account is titled is the same whether an account is set up as belonging to joint tenants with rights of survivorship or as owned by the parties as tenants in common.

On December 23, 1995, Buck died.  He was survived by five children.  A dispute then arose in regard to the ownership of the funds in the Account.  As a result of that dispute, Jordan commenced this action by filing a bill of complaint against NationsSecurities and the executor of the estate of Calvin Hugh Buck (the Estate) seeking a

---

[2]  Mallory H. Buck and Kenneth C. Buck confirmed that their father decided to leave the funds in the Account since it was his understanding that the Estate would receive half of the funds when he died.

declaratory judgment that she, not the Estate, was the sole owner of the Account.[3] In response, NationsSecurities sought to interplead the funds in the Account and be dismissed from the suit. The Estate filed a cross-bill against NationsSecurities and alleged breach of contract and constructive fraud.

At a bench trial on July 22, 1997, the circuit court granted NationsSecurities' motion for summary judgment on the Estate's breach of contract claim. The court also granted partial summary judgment to Jordan and ruled that the Estate had the burden of going forward with the evidence to establish that Buck had not intended for Jordan to receive all the funds in the Account upon his death. The court specifically found that the language in the Agreement signed by Buck and Jordan to open the Account was "clear, unambiguous, and unequivocal and sufficient to rebut the presumption that the account was opened solely as convenience to Mr. Buck."

At the conclusion of the Estate's evidence, the court granted Jordan's motion to strike and ruled that she was entitled to the funds in the Account. However, the court denied NationsSecurities' motion to strike the Estate's

---

[3] As an alternative remedy, Jordan asked for reformation of the Account to the extent necessary to

6

evidence on the constructive fraud claim. After hearing NationsSecurities' evidence, the court determined that the Estate's constructive fraud claim should be dismissed on the basis that the misrepresentation by NationsSecurities that any check issued to close the Account would be payable to Buck and Jordan was a misrepresentation of law and not one of fact, and that the Estate had not proven its damages. The court entered its final order on August 7, 1997. The Estate appeals.

## II.

We first address the assignment of error that pertains to the action commenced by Jordan to determine the ownership of the funds in the Account. The Estate assigns error to the circuit court's ruling, after granting partial summary judgment to Jordan, that the Estate had the burden of going forward with the evidence to show that it was not Buck's intent, at the time that the Account was opened, for title to the Account to pass to Jordan upon his death.

With regard to this issue, the Estate argues that evidence of Buck's intent at or near the time of his death is more compelling than evidence of his intent when the Account was first opened and should be used to determine whether he intended for title to the Account to pass to

_____

entitle her to all the funds in the Account.

7

Jordan upon his death. The Estate contends that Buck's intent with regard to the Account changed after learning that Jordan had withdrawn funds from another joint account. Buck manifested his new intent by revoking a power of attorney previously given to Jordan and removing her name from other joint accounts. Thus, the Estate asserts that Buck's intent just prior to the time of his death rather than the language of the Agreement should be dispositive.

We begin our analysis of this issue by noting that the investment account at NationsSecurities is not an "account" as defined in Code § 6.1-125.1(1).[4] See Bennet v. First & Merchants Nat'l Bank, 233 Va. 355, 360, 355 S.E.2d 888, 891 (1987) (holding Treasury Bill was not an "account" within meaning of Title 6.1, Chapter 2.1). Thus, Code § 6.1-125.5(A), which provides, in pertinent part, that any sum remaining on deposit at the death of a party to a joint account belongs to the surviving party, does not apply to this case.

However, we are not without statutory guidance in resolving this issue. Although Code § 55-20 abolished the common law right of survivorship between joint tenants,

_____

[4] Code § 6.1-125.1(1) defines "account" as "a contract of deposit of funds between a depositor and a financial institution, and includes a checking account, savings

8

Bennet, 233 Va. at 360, 355 S.E.2d at 891, Code § 55-21 creates an exception "when it manifestly appears from the tenor of the instrument that it was intended the part of the one dying should then belong to the others." We have previously held that this section applies to bank accounts, Colley v. Cox, 209 Va. 811, 814, 167 S.E.2d 317, 319 (1969); Wilkinson v. Witherspoon, 206 Va. 297, 304, 142 S.E.2d 478, 483 (1965); Johnson v. McCarty, 202 Va. 49, 56, 115 S.E.2d 915, 920 (1960), and we hold that it equally applies to the Account at issue in this case. Thus, pursuant to Code § 55-21, we must examine the "tenor of the instrument" that Buck and Jordan signed.

In selecting the type of account to be opened at NationsSecurities, Buck and Jordan checked the box for "Joint Tenants with Rights of Survivorship." This section of the Agreement further states that "[i]n the event of the death of either or any of the undersigned, the entire interest in the Joint Account shall be vested in the survivor or survivors . . . ." This language is unambiguous and manifestly signifies the intent that the entire interest in the Account would vest in the surviving tenant upon the death of the other joint tenant. The

_____

account, certificate of deposit, share account, and other like arrangement."

9

Agreement thus satisfies Code § 55-21 and reflects Buck's intent that Jordan would acquire ownership of all the funds in the Account upon his death.

In reaching this conclusion, we are not unmindful of the presumption "that a deposit by a person in the name of himself and another, not his wife, was made for the convenience of the depositor, and the presumption is strengthened by the illness or disability of the depositor." Thurston v. Maggard, 220 Va. 815, 818, 263 S.E.2d 64, 66 (1980).[5]  However, we have addressed language in other account agreements or signature cards similar to that at issue in this case and concluded that, in light of such language, this presumption "pales" or is overcome. Wilkinson, 206 Va. at 305, 142 S.E.2d at 483; accord Thurston, 220 Va. at 818, 263 S.E.2d at 66; Robbins v. Grimes, 211 Va. 97, 100, 175 S.E.2d 246, 248 (1970); Campbell v. Campbell, 211 Va. 31, 33, 175 S.E.2d 243, 245 (1970).  In contrast, we held in Colley, 209 Va. at 817, 167 S.E.2d at 321, that no survivorship account was created because the depositor gave no instructions to the bank when an account was opened and the signature card did not

_____

[5] In regard to contracts of deposit between a depositor and a financial institution, Code § 6.1-125.5 abolished this presumption, effective July 1, 1980.  Thurston, 220 Va. at 818 n. *, 263 S.E.2d at 66 n. *.

10

contain any contractual language indicative of the intent to create a survivorship account.

The Estate, nevertheless, argues that our decisions in Wilkinson and Thurston are not applicable to this case because the signature cards in those cases not only included language vesting title to the accounts in the surviving joint tenants but also contained an agreement between the joint tenants that any funds deposited in the accounts during their joint lives would be joint property. Although the Agreement in this case does not contain this additional language, we, nevertheless, conclude that the Agreement manifests a clear intention on the part of Buck that the Account would belong to Jordan upon his death.

As we have previously stated, "the rights of the parties are to be determined . . . by rules pertaining to the interpretation of contracts." Wilkinson, 206 Va. at 304, 142 S.E.2d at 483. The Agreement is a contract between Buck, Jordan, and NationsSecurities, and the rules for interpreting contracts require that we give effect to the intention of the parties. Id. "Where the terms of the deposit show a clear intention that title shall vest in the survivor, the intention is upheld." Thurston, 220 Va. at 818, 263 S.E.2d at 66.

Thus, we conclude that the circuit court did not err when it required the Estate to go forward with the evidence to show a contrary intent at the time the Account was opened.  After finding that the signature card in Thurston rebutted the presumption that the account was opened as a convenience to the decedent, we specifically stated that the burden of going forward with the evidence fell upon those opposing the claim of the surviving joint tenant. Id. at 819, 263 S.E.2d at 67.  We then noted that no attempt was made to establish that the decedent was mentally incompetent when he executed the signature card or that he signed by mistake or as a result of undue influence.  Id.  Likewise in the present case, the Estate did not present evidence of fraud, undue influence, or mental incompetence at the time Buck signed the Agreement. Absent such proof, the ownership of the Account as evidenced by the Agreement prevails.  Since the Agreement is a contract between three entities, it cannot be altered solely because one party's intent changes.  Therefore, evidence that Buck's intent changed subsequent to opening the Account is not pertinent to determining whether Jordan acquired title to the Account upon Buck's death.

We next address the Estate's assignment of error with regard to the circuit court's granting NationsSecurities'

12

motion for summary judgment on the breach of contract claim.  The Estate claims that NationsSecurities breached its contract with Buck by refusing to close the Account and issue a check for the proceeds solely in Buck's name.  We do not agree.

One of the essential elements of a cause of action for breach of contract is that a legal obligation exists from one party to another.  Caudill v. Wise Rambler, 210 Va. 11, 13, 168 S.E.2d 257, 259 (1969).  The Agreement authorizes but does not obligate NationsSecurities to make payments of the monies in the Account, even if such payments are to only one of the joint tenants.  Thus, NationsSecurities had no legal obligation to issue a check solely in Buck's name, and the trial court, therefore, did not err in granting summary judgment for NationsSecurities on this issue.

In paragraph 16 of the Agreement, Buck and Jordan agreed, in consideration of NationsSecurities' carrying the joint account, that each of them could individually take actions with respect to the Account without notice to the other joint tenant and authorized NationsSecurities to follow the instructions of either one of them.  Paragraph 16 allows NationsSecurities to deal fully and completely with either joint tenant as though either one of them was solely interested in the Account.  Thus, as Calliott

13

explained, NationsSecurities would accept instructions from either joint tenant to sell a security and provide proceeds, but it would issue a check made out exactly as the account is titled, which in this case was C.H. Buck and Sandra B. Jordan as joint tenants.  Nothing in the Agreement requires NationsSecurities to do otherwise.

Turning now to the constructive fraud claim, we first consider the Estate's assignment of error that the trial court erred by ruling that NationsSecurities' "misrepresentations as to the type of account in which Calvin Buck's money was invested were only misrepresentations of law, not misrepresentations of fact." The Estate argues that the statements by NationsSecurities that the Account was registered as being held by tenants in common when actually it was owned by two joint tenants with rights of survivorship was a misrepresentation of fact.

In response, NationsSecurities contends that the misrepresentation contained in the Estate's assignment of error was neither relied upon by it before the circuit court nor decided by that court.  NationsSecurities also contends that the Estate did not object to the court's failure to rule on the issue whether the statement that the Account was held as tenants in common was a misrepresentation of law or fact.  Thus, NationsSecurities

14

asserts that the Estate has procedurally defaulted this assignment of error. We agree.

The Estate never advised the circuit court that the misrepresentation upon which it was relying to assert a claim for constructive fraud was the statement that the Account was registered as tenants in common.[6] Instead, the Estate argued to the circuit court that the misrepresentation of fact was that Jordan was an owner of the Account and that the Estate and Jordan would each receive 50 percent of the Account upon Buck's death.[7] Moreover, when the circuit court specifically identified the misrepresentation upon which it was ruling, the Estate

_____

[6] The Estate also did not plead this misrepresentation. In its cross-bill, it alleged that NationsSecurities committed constructive fraud based on its false representations that Buck could not withdraw the funds in the Account unless Jordan's name appeared on the check. In Henderson v. Henderson, 255 Va. 122, 126, 495 S.E.2d 496, 499 (1998), we stated that "[f]raud, whether actual or constructive, is never presumed and must be strictly proved as alleged." Accord Mortarino v. Consultant Eng'g Serv., 251 Va. 289, 295, 467 S.E.2d 778, 782 (1996).

[7] The following excerpt is an example of the Estate's argument before the circuit court:
   [T]he representation is as an existing fact and that existing fact is whether or not Sandra Jordan was an owner of this account . . . . And there was a clear representation that was not only made once, but it was reiterated, that she was the owner and that the Estate would have 50 percent of it . . . .

15

did not object.[8]  And the Estate never objected to the
court's failure to decide whether the misrepresentation
regarding how the Account was held was one of law or fact.

Rule 5:25 provides, in part, that "[e]rror will not be
sustained to any ruling of the trial court . . . unless the
objection was stated with reasonable certainty at the time
of the ruling . . . ."  This Court has held that "[t]he
purpose of requiring timely specific objections is to
afford a trial court the opportunity to rule intelligently
on the issues presented, thereby avoiding unnecessary
appeals and reversals."  Chawla v. BurgerBusters, Inc., 255
Va. 616, 622, 499 S.E.2d 829, 832 (1998) (citing Wright v.
Norfolk & Western Ry. Co., 245 Va. 160, 167-68, 427 S.E.2d
724, 728 (1993)).  We have repeatedly refused to consider
issues or objections raised for the first time on appeal.
See, e.g., Cardinal Dev. Co. v. Stanley Constr. Co., Inc.,
255 Va. 300, 305, 497 S.E.2d 847, 850 (1998); Fairfax Hosp.
v. Curtis, 254 Va. 427, 447-48, 492 S.E.2d 642, 648 (1997);
Angstadt v. Atlantic Mut. Ins. Co., 254 Va. 286, 291, 492
S.E.2d 118, 121 (1997); Clarendon House, Inc. v. Helfert,

---

[8] In announcing its decision, the circuit court
specifically identified the misrepresentation upon which it
was ruling by stating, "The misrepresentation is that
someone at [NationsSecurities] informed the decedent that
he could not withdraw the account unless [Jordan's] name
appeared on the check."

213 Va. 28, 29, 189 S.E.2d 331, 331 (1972). Thus, we conclude that the Estate waived the assignment of error as presented and failed to assign error to the trial court's actual finding that the statement that Buck could not withdraw the funds in the Account without Jordan's name appearing on the check was a misrepresentation of law. Therefore, we conclude that the circuit court did not err in granting judgment for NationsSecurities on the constructive fraud claim.[9]

For these reasons, we will affirm the judgment of the circuit court.

<u>Affirmed</u>.

---

[9] We need not address the remaining assignment of error regarding the circuit court's finding that the Estate did not suffer any damages.